PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 1 1997**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

SK FINANCE SA,

    Plaintiff-Appellant,

    v.

LA PLATA COUNTY, BOARD OF
COUNTY COMMISSIONERS,

    Defendant-Appellee.

No. 96-1291

Appeal from United States District Court
for the District of Colorado
(D.C. No. 95-S-683)

Alvin M. Cohen, of Roos, Cohen & Long, P.C., Denver, Colorado, for the
appellant.

Michael A. Goldman, of McLachlan & Goldman, LLC, Durango, Colorado, for
the appellee.

Before EBEL, HENRY, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

SK Finance, the owner of several lots in the Durango Estates Subdivision (Subdivision) in LaPlata County, Colorado, appeals from a district court order dismissing as premature SK Finance's federal and state takings claims and state-law vested rights claim arising from LaPlata County's denial of a request to build a sewage treatment facility to serve a portion of the Subdivision.  We affirm.

I.

In 1970 and 1971, Colorado Land Management, Inc., submitted plats for the Subdivision to LaPlata County.  The planning commission approved the plats and the plats were subsequently recorded.  A note on the plats signed by Robert Balliger, director of the San Juan Health Unit, reads:  "Subject to approved community water and sewer systems, as per agreement dated June 17, 1970."  Appellant's append. at 100.  The agreement referenced in the note cannot be found, but apparently it required some kind of community sewer system as opposed to individual septic tanks.  At the time the plats were approved, the Colorado Department of Health (CDH) was the only governing entity that had adopted sewage treatment regulations.  Balliger testified the note on the plats required that water and sewage systems serving the Subdivision be approved by the CDH.

Since approval of the plats, successive owners of the Subdivision have constructed many on-site improvements, including roads, water lines, and sewer

-2-

lines, and have incurred engineering and legal fees. Several lots in the Subdivision have been sold. All of the improvements were allegedly done in reliance on the approved plats for the Subdivision.

In 1982, the developer of the Subdivision attempted to develop approved water and sewer service for the Subdivision, submitting an application for approval of an aerated sewer lagoon system to the CDH. The CDH denied the application. The CDH indicated to the developer that it would not approve an on-site sewage treatment system unless the developer was unable to contract for sewage treatment from the City of Durango (City). The developer made such a request in 1986, but the request was set aside with the developer's concurrence pending creation of a land use plan. LaPlata County developed the Junction Creek Area Land Use Plan (Plan) in 1986, primarily to provide sewer service to the Subdivision. The Plan recognized that development of a mechanical sewage treatment system would be "a poor practice because of the high potential for failure and problems associated with organization and management by small special districts or homeowner groups." Id. at 279. The Plan recommended that the Subdivision secure sewer and water service through a special district that would contract with the City for sewage treatment through an extension of the City's sewer utility system. The Plan found the Subdivision's 1986 application unacceptable because it required the City to administer and operate the sewer

extensions and engage in activities outside its jurisdiction. Thus, the Plan called for a "metro" district that would contract with the City to tie into its sewer system.

The City entered into an intergovernmental agreement with LaPlata County in 1987 to extend sewer service to the Subdivision through contracts with appropriate legal entities with the capacity to operate the system within the area. The agreement lapsed before the developer of the Subdivision formed any legal entity to enter into any agreement with the City for sewer service. Nevertheless, the City remains willing to negotiate to provide sewer service to the Subdivision if a legal entity is created that is capable of managing and maintaining the system as provided by the Plan. The principal problem with connecting to the City's sewer facilities appears to be that the City requires ductile iron pipe while the Subdivision was improved with PVC pipe.

In 1990, the Durango Estates Property Owners Association (DEPOA) submitted a proposal to connect with the City's sewer service. The proposal varied in significant ways from the provisions of the Plan, requiring the City to own, administer, and maintain the sewer main. In rejecting the proposal, the City found the financial projections were insufficiently complete and that a contract with the Subdivision was "premature." DEPOA's engineer testified that the City did give DEPOA guidance on what it could do to satisfy the City's concerns and

-4-

stated, "if you'd've followed that road map, [DEPOA would have] ended up in a project that could've been built," albeit expensively. Id. at 180-81. However, DEPOA never pursued the process far enough to determine what the cost would be.

DEPOA did not submit a revised proposal providing the information that the City needed, but instead in 1991 it elected to attempt to build and operate an on-site sewage treatment plant, which would serve less than one quarter of the platted lots. LaPlata County and its planning commission recommended to the CDH that the application be approved. The CDH approved the proposal, but stated: "This review does not relieve the owner from compliance with all city or county regulations prior to construction nor from the responsibility for proper engineering, construction, and operation of the facility." Id. at 45.

LaPlata County required a Class II land use permit before the treatment plant could be constructed. The planning commission evaluated the application for a permit and recommended its denial. In part, the evaluation considered the fact that even if the permit was granted, other problems with the Subdivision would prevent it from being viable; thus, the fiscal viability of the plant became an issue and the planning commission found it lacked adequate information for consideration of that issue. LaPlata County rejected the application. DEPOA appealed the decision to state district court, and the decision was affirmed. The

court found there was evidence to support the conclusion that DEPOA lacked the economic stability to make its plan work effectively and that the proposed plant could endanger local waterways. DEPOA met with the planning commission concerning a replat of the Subdivision, but no replat or variance application has been submitted.

SK Finance took title to 196 of the 420 lots in the Subdivision in lieu of foreclosure and initiated this action against LaPlata County in March 1995. SK Finance asserted jurisdiction in federal court based on a Fifth Amendment takings claim and diversity of citizenship. SK Finance pursued a state-law claim for impairment of vested rights, an inverse condemnation claim under the United States Constitution, and an inverse condemnation claim under the Colorado Constitution. LaPlata County filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that the claims were not ripe for judicial review, and also filed a motion for summary judgment. The assigned magistrate judge recommended that the motion to dismiss be granted, and the district court dismissed the action.

II.

SK Finance contends the district court erred in concluding its claims were not ripe. We conduct a de novo review of the decision to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Walden v. Bartlett, 840

-6-

F.2d 771, 772-73 (10th Cir. 1988).  When, as here, a party attacks the factual

basis for subject matter jurisdiction, the court may not presume the truthfulness of

the factual allegations in the complaint, but may consider evidence to resolve

disputed jurisdictional facts.  Holt v. United States, 46 F.3d 1000, 1003 (10th Cir.

1995).  Reference to evidence outside the pleadings does not convert the motion

to dismiss into a motion for summary judgment in such circumstances.  Id.


*A.  Federal and state-law takings claims*

We first consider whether SK Finance's claim under the takings clause of

the Fifth Amendment of the United States Constitution is ripe.

> The issue whether a claim is ripe for review bears on the court's
> subject matter jurisdiction under Article III of the Constitution.
> Accordingly, a ripeness challenge, like most other challenges to a court's
> subject matter jurisdiction, is treated as a motion to dismiss under Federal
> Rule of Civil Procedure 12(b)(1).  Ripeness is a question of law, which we
> examine *de novo*.

Bateman v. City of West Bountiful, 89 F.3d 704, 706 (10th Cir. 1996) (internal

citations omitted).  "Before a federal court can properly determine whether the

state has violated the Fifth Amendment [takings clause], the aggrieved property

owner must show first that the state deprived him of his property, and second, that

the state refused to compensate him for his loss."  Miller v. Campbell County, 945

F.2d 348, 352 (10th Cir. 1991).  Because the Fifth Amendment only prohibits

takings without just compensation, a federal constitutional claim is not ripe until

-7-

compensation is denied under state procedures, if adequate state procedures exist. Bateman, 89 F.3d at 708; see, e.g., National Advertising Co. v. City & County of Denver, 912 F.2d 405, 413-14 (10th Cir. 1990). An inverse condemnation cause of action arising under a state's constitution is such a procedure that must be utilized before a federal takings claim can mature. See Bateman, 89 F.3d at 708-09.

As the State of Colorado has provided a procedure for obtaining compensation for inverse condemnation, see Colo. Rev. Stat. § 38-1-101 *et seq.*, and SK Finance has not availed itself of that procedure, SK Finance's federal takings claim is not ripe. SK Finance conceded at oral argument of this appeal that its federal takings claim is not ripe.

More difficult questions arise with respect to SK Finance's state inverse condemnation claim. Two particular issues merit consideration: (1) Can a federal district court with diversity jurisdiction consider an inverse condemnation claim arising from the Colorado Constitution and statutes providing a special judicial procedure for condemnation claims; and (2) is an inverse condemnation claim ripe under Colorado law?

Eminent domain proceedings under Colorado law, which include claims for inverse condemnation, are special statutory actions filed in court rather than before administrative agencies. See Colo. Rev. Stat. § 38-1-101 *et seq*; see

generally <u>Hayden v. Board of County Comm'rs</u>, 580 P.2d 830 (Colo. App. 1978); <u>Ossman v. Mountain States Tel. & Tel. Co.</u>, 520 P.2d 738 (Colo. 1974). LaPlata County contends state compensation procedures must be pursued in state court and cannot be asserted merely as alternative theories in takings claims asserted in federal court, citing <u>Samaad v. City of Dallas</u>, 940 F.2d 925, 934-35 (5th Cir. 1991). The <u>Samaad</u> court held the requirement that plaintiff first seek recovery through state procedures implied plaintiff must use state courts rather than federal courts to pursue a state claim, concluding, "The local entity from which a plaintiff seeks recovery should be the one to deny just compensation." <u>Id</u>. at 934.

We reject the Fifth Circuit's reasoning on this point. In <u>Searl v. School Dist. No. 2</u>, 124 U.S. 197, 199-200 (1888), the Court held an action started in state court under Colorado's eminent domain statute can be removed to federal court when there is diversity of citizenship. This determination necessarily establishes the action could have been brought initially in federal court. <u>See Madisonville Traction Co. v. St. Bernard Mining Co.</u>, 196 U.S. 239, 245-46 (1905) ("[A] suit cannot be removed from a state court unless it could have been brought originally in the circuit court of the United States."). Consequently, the district court had jurisdiction to consider SK Finance's state-law inverse condemnation claim if it was ripe.

As under federal law, an inverse condemnation action under Colorado law requires a "final decision" of a regulatory authority to support a regulatory taking claim. Reale Investments, Inc. v. City of Colorado Springs, 856 P.2d 91, 93 (Colo. App. 1993) (citing Williamson Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985)).

> [A] regulatory taking is not ripe "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." A "final decision" requires not only an initial rejection of a *particular* development proposal, but a definitive action by local authorities indicating with some specificity what level of development will be permitted on the property in question.

Landmark Land Co. v. Buchanan, 874 F.2d 717, 720 (10th Cir. 1989) (internal citations omitted; emphasis added). In Williamson, the Supreme Court explained why a final determination is critical:

> Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

473 U.S. at 190-91 (internal citations omitted). See also Suitum v. Tahoe Regional Planning Agency, 117 S. Ct. 1659, 1670-71 (1997) (Scalia, J., concurring) (explaining purpose and nature of finality requirement).

The present status of this case does not establish the degree to which SK Finance's reasonable investment-based expectations will be impacted by the decision not to approve construction of an on-site sewage system capable of serving fewer than one quarter of the platted lots. SK Finance has not sought approval for a sewage system capable of fully supporting the Subdivision, and has not attempted to address LaPlata County's concern for the financial viability of the project. Although the owners of the development have from time to time pursued various mechanisms to provide sewer service, they have not entered into negotiations with LaPlata County with the result being that no sewer system is possible. LaPlata County designed a plan to provide sewer service, which was rejected by SK Finance's predecessors. The predecessors were given guidance to pursue such service, but they did not follow through on the recommendations. The fact that the developer installed piping that was incompatible with the City's sewer system does not illustrate state action that would support a takings claim.

In Landmark, the plaintiff alleged the defendant's failure to issue building permits for a development previously approved by the defendant constituted a taking. We found the issue was not ripe because "[t]he City has neither indicated definitively what level of development will be allowed on Landmark's property, nor finally and officially ruled out the possibility that Landmark will be able to proceed with its original plans." 874 F.2d at 721. We held "Landmark's claim

-11-

will not be ripe until it is in a position to allege not only that its initial permit applications were denied, but also that it has made some effort to pursue compromise with the City that would allow some level of development." Id.; see also Bateman, 89 F.3d 704.

The district court did not err in finding SK Finance's state-law takings claims were unripe because LaPlata County had not rendered any final decision regarding the permissibility of a sewer system serving the Subdivision.

## B. State-law vested rights claim

This litigation ensues solely from the fact that DEPOA was not permitted to construct a specific CDH-approved sewage treatment facility that would not have provided sewer service to the entire Subdivision. The vested-rights claim can withstand a motion to dismiss only if the Subdivision landowners could have some vested right to construct this particular improvement. SK Finance can claim no vested right in the process by which it must obtain permission to construct an improvement. See City of Aspen v. Marshall, 912 P.2d 56 (Colo. 1996) (incomplete application under old ordinance did not vest any rights); People v. D.K.B., 843 P.2d 1326 (Colo. 1993) (substantive statutes, not procedural statutes, may affect vested rights). Any vested right must be a substantive one created by the act of signing the plats.

-12-

Approval of a plat is a prerequisite to construction of any "road, park, or other public way, ground, or space, . . . public building or structure, or . . . public utility, whether publicly or privately owned." Colo. Rev. Stat. § 30-28-110(1)(a). Nothing in the statute giving LaPlata County the power to approve a plat provides that such approval is sufficient in itself to permit construction of any improvement. The effect of the approval and recording of a plat is to permit the owner of the Subdivision to transfer or sell land by reference to the plat without penalty. Colo. Rev. Stat. § 30-28-110(4). Beyond that, the approval has no specific effect by statute. Cf. Colo. Rev. Stat. § 30-28-110(3)(b) (approval does not create acceptance of proposed dedications to the public). Thus, the statutes under which LaPlata County approved the Subdivision plats, subject to the note, did not provide that approval of the plats carried with it the right to develop in accordance with the plats. In 1987, the legislature enacted the Vested Property Rights Act to provide that, in the future, approval of a subdivision would create a vested property right to "undertake and complete the development and use of property under the terms and conditions" of the approved plats. Colo. Rev. Stat. § 24-68-102(5). Enactment of the Act was based on a finding that

> [i]t is necessary and desirable, as a matter of public policy, to provide for the establishment of vested property rights in order to ensure reasonable certainty, stability, and fairness in the land use planning process and in order to stimulate economic growth, secure the reasonable investment-backed expectations of landowners, and foster cooperation between the public and private sectors in the area of land use planning.

-13-

Colo. Rev. Stat. § 24-68-101(1)(a). The Act applies only to those subdivision plats approved on or after January 1, 1988, and thus does not create vested rights in this case. Colo. Rev. Stat. § 24-68-106(4). Nevertheless, the legislature recognized a vested property right may arise by common law principles. See Colo. Rev. Stat. § 24-68-106(3) (Act does not preclude judicial determination of vested rights based on common law principles).

In Villa at Greeley, Inc. v. Hopper, 917 P.2d 350 (Colo. App. 1996), as in this case, the developer had secured approval of a specific site development plan, but had not yet secured building permits.

> The general rule . . . provides that a common law right to develop does not vest until the party has taken substantial steps in reliance on a building permit.
> Here, the record supports the intervenor's contention that no permits have been issued, and thus, as a matter of law, no common law right to development has vested.

Id. at 356 (internal citations omitted). Under Villa, in the absence of a building permit, SK Finance has no vested common-law development rights as a matter of law. Thus, it is apparent from the face of the complaint that this claim must be dismissed. Until SK Finance has obtained a building permit, a vested rights claim cannot be ripe under Colorado common law.

In addition, nothing in the approval of the plat suggests unconditional approval to build any sewer system the CDH might approve. Instead, the plat note merely informs property owners that development of the platted land cannot

-14-

occur before CDH-approved sewer and water service are obtained. The note does not purport to remove the risk of not obtaining such service from the landowners by waiving any procedural obstacles, but rather makes the risk of not obtaining sewer and water service explicit. Cf. P-W Investments, Inc. v. City of Westminster, 655 P.2d 1365, 1371 (Colo. 1982) (tap permits could not reasonably be read as guaranteeing availability of sewer connection rather than simply authorizing installation of tap).

Moreover, while developers of the Subdivision may have relied on approval of the plat in a general sense, both in constructing improvements and in selling lots, there is no evidence they took any substantial steps based on any act of LaPlata County ostensibly approving the proposed partial on-site sewer facility. Nothing in the approved plat contemplates construction of the specific improvement that DEPOA sought to construct. Compare Gramiger v. County of Pitkin, 794 P.2d 1045, 1049 (Colo. App. 1989) (potential exception to permit requirement for vested rights claim would require approval of *the specific improvement* by some other authorization). The only reliance alleged by SK Finance was based on the supposed right to acquire some kind of CDH-approved sewer service. As discussed, the record establishes the owners of the Subdivision have not been completely denied that right in any final sense and, thus, the vested right claim, like the constitutional takings claim, is not ripe.

Further, the improvements made to the Subdivision were clearly not made in reliance on the availability of a CDH-approved sewer system. At the time the improvements were made, the landowners had no indication that an approved sewer system was even possible. They did not get CDH approval and then rely on the plat note in making improvements. Rather, they incurred costs of improvements to the Subdivision with full knowledge of no approved sewer system and no permit to build a sewer treatment plant. Cf. Jones v. First Virginia Mortgage and Real Estate Inv. Trust, 399 So. 2d 1068, 1074 (Fla. App. 1981) (mortgage lender dispersing funds before final approval and building permits obtained, despite right to wait, could not assert estoppel). This distinguishes the present case from the otherwise similar case of Eklund v. Clackamas County, 583 P.2d 567 (Or. App. 1978), in which a plat was approved subject to the condition that a water system for the entire subdivision be approved by the state health division. In Eklund, unlike here, the health division granted approval and the developer built a complete water system capable of supporting the entire subdivision. The boundary commission subsequently sought to require the developer to obtain its approval to connect to the water system and that approval was denied. In that circumstance, where the developer secured approval *before* building the approved facility, the developer's reliance was sufficient to create a vested right to complete the project as planned. Similarly, in Florida Companies

v. Orange County, 411 So. 2d 1008 (Fla. App. 1982), equitable estoppel came into play because the sewer treatment facilities were *actually built* in reliance on preliminary approval of a plat including such facilities. The county was estopped from requiring, after the facilities were seventy percent complete, that septic tanks be used. Neither SK Finance nor its predecessors premised improvements on a sewage treatment system that was approved at the time the improvements were made. Nor did they undertake to construct the system once it was approved by CDH.

In sum, SK Finance's vested rights claim is not ripe because it has not yet secured any vested right, and LaPlata County has not yet finally divested even the right that SK Finance claims has vested.

III.

AFFIRMED.

-17-